RECEIVED

CAUSE NO. 03CV0214

JAN 1 2 2006

**KATHRYN KELLY STEVENS, TRUSTEE OF**
**THE NAYLOR GRANDCHILDREN'S TRUST**
**F/B/O NATALIE GRACE NAYLOR,** *ET AL.*,

IN THE DISTRICT~~COURT~~ U.S. DISTRICT COURT
ANCHORAGE ALASK·

§
§
§
§

    **PLAINTIFFS**

§
§

*3: 06cv 08 JKS*

**V.**

§
§

**405TH JUDICIAL DISTRICT**

**NEW BRIDGE PARTNERS, LLC N/K/A**
**VICTORY CAPITAL MANAGEMENT, INC.;**
**AND MCKINLEY CAPITAL MANAGEMENT,**
**INC.,**

§
§
§
§
§

    **DEFENDANTS**

§
§

**GALVESTON COUNTY, TEXAS**

---

**PLAINTIFFS' FIRST AMENDED PETITION**

---

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Plaintiffs, Naylor Grandchildren's Trust ("NGT") f/b/o Natalic Grace Naylor, NGT f/b/o Hanah Elisabeth Naylor, NGT f/b/o Madaline Leah Naylor, NGT f/b/o Donna Claire Naylor, NGT f/b/o Katherine Rose Stevens, Trevor James Stevens 1995 Trust, Grace Caroline Naylor 1996 Trust, Rhett Sentell Naylor 1997 Trust, Audrey Catherine Wheeler 1997 Trust, Naylor Children's Trust ("NCT") f/b/o Nancy Lavonne Henry, NCT f/b/o Timothy Norwood Naylor, NCT f/b/o Kathryn Kelly Stevens, NCT f/b/o Douglas D. Naylor, NCT f/b/o William S. Naylor Jr. (collectively, **"Plaintiffs"** or **"Plaintiff Trusts"**), by and through their common trustee Kathryn Kelly Stevens ("Stevens" or **"Trustee"**), file this First Amended Petition in the above-styled and numbered cause of action and would respectfully show the Court as follows:

**EXHIBIT**

A

## I. DISCOVERY CONTROL PLAN

1.       Discovery is to be conducted under Level 2 of TEX. R. CIV. P. 190.2.

## II. PARTIES

2.       Plaintiffs are the named Texas trusts on whose behalf this cause of action has been

brought by and through their common trustee, Kathryn Kelly Stevens.

3.       Defendant NewBridge Partners, LLC n/k/a Victory Capital Management

("**NewBridge**") is a foreign corporation headquartered in Ohio and conducting business in Texas.

NewBridge can be served with process by serving its registered agent Corporation Service Company

at 701 Brazos Street, Austin, Texas 78701.

4.       Defendant McKinley Capital Management, Inc. ("**McKinley**") is a foreign

corporation headquartered at 3301 C Street, Suite 500, Anchorage, Alaska 99503.

McKinley conducts business in Texas, does not maintain a regular place of business in Texas, and

has failed to designate a resident agent to accept service of process. McKinley can be served

pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(a)(1) & (b) by serving the Texas Secretary of

State.

## III. JURISDICTION AND VENUE

5.       The Court has *in personam* jurisdiction over each Defendant because each regularly

conducts business in Texas and because this cause of action arises from the business Defendants

conducted in Texas. The court has subject matter jurisdiction over this cause of action because the

amount in controversy is within its jurisdictional limits. Venue is proper in this county pursuant to

TEX. CIV. PRAC. & REM. CODE § 15.002(a)(1) because all or a substantial portion of the events or

omissions giving rise to Plaintiffs' claims occurred in Galveston County, Texas.

-2-

### IV. AFFECTED INTERESTS

6.    These 14 trusts were established and are for the independent benefit of 14 distinct individuals each of whom is indicated in the trust's name. Pursuant to the trust-creating and amending documents, Kathryn Kelly Stevens is and was the trustee for all of the Plaintiff Trusts.

### V. FACTS

7.    In early to mid 2000, the Plaintiff Trusts transferred all of their assets to Morgan Stanley DW, Inc. ("**MSDW**"), as custodian and with the understanding that the assets would be managed by outside investment advisers. The Plaintiff Trusts engaged the two investment advisors—Defendants NewBridge and McKinley—recommended by MSDW and entered investment management contracts with each. These contracts are attached as Exhibits "1" and "2."

8.    Under the contract with NewBridge, Plaintiffs appointed NewBridge their "agent and attorney-in-fact with full discretionary power to effect transactions" on Plaintiffs' behalf. *See* Exhibit 1, ¶ 2. In this role, NewBridge was contractually granted "full responsibility and authority to control and manage the investment of the assets" of the Plaintiff Trusts. *See id.*

9.    Under the contract with McKinley, Plaintiffs appointed McKinley their "investment adviser and sole agent and attorney-in-fact ... with full power and authority to manage" the assets of Plaintiff Trusts. *See* Exhibit 2. Included within these powers was the exclusive authority to invest the assets of Plaintiff Trusts – even to the exclusion of Plaintiffs themselves. *Id.* at ¶ 1.

10.    Approximately one-half of the assets were put under management of NewBridge, with the remainder under McKinley's care. Due to Defendants' gross mismanagement, breach of fiduciary duty, and/or total abdication of duties, the value of Plaintiffs' assets plummeted from $2,470,000 to ~$728,000, or over 70%. Despite their promise and duty to actively manage

Plaintiffs' assets, neither Defendant took any substantive corrective action to stem the hemorrhaging of the accounts.

## VI. CONDITIONS PRECEDENT

11.    All conditions precedent have been performed by Plaintiffs, have occurred as required, or have been waived or excused by Defendants.

## VII. CAUSES OF ACTION

### A. Breach of Contract

12.    Plaintiffs entered valid, enforceable contracts with each Defendant. Plaintiffs performed or were excused from performing their contractual obligations. Each Defendant breached its contract with Plaintiffs and thereby caused injury to Plaintiffs.

### B. Breach of Fiduciary Duty

13.    Plaintiffs had fiduciary relationships with each Defendant by virtue of the fact that each Defendant enjoyed and exercised full discretion and authority to control the transactions in Plaintiffs' account. Each Defendant also owed Plaintiffs fiduciary duties because Plaintiffs reposed absolute trust and confidence in Defendants with respect to the management of their investments. Each Defendant breached the fiduciary duties owed Plaintiffs, which resulted in injury to Plaintiffs and/or benefit to Defendants.

### C. Negligence

14.    Each Defendant owed a duty of care to Plaintiffs. This duty required Defendants to exercise the degree of care, skill, and competence that reasonable, competent members of their profession would exercise under similar circumstances. Each Defendant breached this duty, which proximately caused injury to Plaintiffs.

### D. Deceptive Trade Practices

15.     Plaintiffs are consumers within the meaning of the DTPA because they sought and/or acquired by purchase the services of Defendants. Defendant NewBridge violated the DTPA by: (1) engaging in an unconscionable action or course of action with respect to the handling of Plaintiffs' investment account; (2) engaging in false, misleading and deceptive practices; (3) disseminating statements it knew materially misrepresented the character of the investment services it offered and for the purpose of selling and/or inducing Plaintiffs to purchase these investment services; (4) passing of the services of another as its own; (5) causing confusion as to the source of services; (6) causing confusion or misunderstanding at to the affiliation, connection, or association with another; and (7) representing that goods are of a particular standard, quality, or grade when they were of another. Defendant NewBridge's violations of the DTPA are the producing cause of actual damages to Plaintiffs. Additionally, Defendant NewBridge's violations of the DTPA were done knowingly and/or intentionally. Therefore, Plaintiffs are entitled to the minimum statutory doubling and discretionary trebling of damages, as well as their reasonable and necessary court costs and attorneys' fees.

### VIII. DISCOVERY RULE AND FRAUDULENT CONCEALMENT

16.     If and to the extent necessary, Plaintiffs plead that the discovery rule and doctrine of fraudulent concealment operated to suspend or toll any applicable statute of limitations.

### IX. REQUEST FOR A JURY TRIAL

17.     Plaintiffs request a trial by jury.

### X. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, by and through their common trustee Kathryn Kelly Stevens, request the Court cite Defendants to appear before the Court, and after a trial by jury, enter a judgment against Defendants awarding Plaintiffs:

(1)    Actual damages;

(2)    Punitive damages;

(3)    Disgorgement of all fees;

(4)    Attorneys' fees incurred by Plaintiffs in the prosecution of this cause of action;

(5)    Pre-judgment and post-judgment interest;

(6)    Costs of court;

(7)    Injunctive relief; and

(8)    For such other and further relief, both general and special, at law or in equity, to which Plaintiffs may show themselves to be justly entitled.

Respectfully submitted,

**PULMAN, BRESNAHAN & PULLEN, LLP**
6919 Blanco Road
San Antonio, Texas 78216
(210) 222-9494 Telephone
(210) 892-1610 Telecopier

By: _____

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Lance Hunter "Luke" Beshara
Texas State Bar No. 24045492
lbeshara@pulmanlaw.com

**ATTORNEYS FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of September, 2005, a true and correct copy of the above and foregoing Plaintiffs' First Amended Petition has been transmitted in accordance with the requirements of the Texas Rules of Civil Procedure, addressed as follows:

*Via Telecopier to (713) 229-7946:*

Mr. David D. Sterling
Baker Botts, LLP
910 Louisiana Street
Houston, Texas 77002

Randall A. Pulman

# Exhibit 1

*Technolgy*

## INVESTMENT MANAGEMENT CONTRACT

This Investment Management Contract is entered into as of the ___ day of _June_ 1999, by and between NewBridge Partners, LLC, a Delaware limited liability company (the "Investment Manager") and _Kathryn Kelly Stevens TTEE_ the ("Client").

### 1. Appointment of the Investment Manager.

The Client hereby appoints the Investment Manager as investment manager of the assets of the Client that are currently or subsequently placed in the custody account(s) (the "Account") specified in the Delegation of Investment Power that has been executed and attached hereto as Schedule A (the "Delegation of Investment Power").

### 2. Authority of the Investment Manager.

The Investment Manager shall have full responsibility and authority to control and manage the investment of the assets of the Account. Pursuant to the Delegation of Investment Power, the Client is appointing the Investment Manager as its agent and attorney-in-fact with full discretionary power to effect transactions for the Account on behalf and at the sole risk and expense of the Client, without prior consultation with the Client.

### 3. The Custodian.

The Client agrees to instruct the Broker/Custodian (as defined in the Delegation of Investment Power) to execute all transactions directed by the Investment Manager through such brokers, dealers and banks as the Investment Manager may select in its sole discretion. The Client acknowledges and agrees that it has appointed the Broker/Custodian as the custodian of the assets of the Account and that the Investment Manager shall have no responsibility or liability with respect to any custody arrangements or the acts, omissions or other conduct of the Broker/Custodian. The Client hereby further acknowledges and agrees that it shall be responsible for paying the Broker/Custodian's custody fees, if any, and any and all obligations and liabilities, including brokerage commissions, that are incurred by the Broker/Custodian for the account of the Client at the direction of the Investment Manager, as authorized hereby. The Client further agrees to indemnify and hold the Investment Manager and its officers, directors, shareholders, employees and agents ("Related Persons"), harmless from any liability, loss, cost, expense or damage (including reasonable attorneys fees and disbursements) that may arise out of the Client's failure to perform its obligations under the preceding sentence.

### 4. Reports.

The Investment Manager will send the Client a quarterly valuation of the Account at market. The Investment Manager will also direct the Broker/Custodian to promptly send to the Client confirmation of all purchases, sales and trades.

1

MS 00419

5.  Fees.

The Client agrees to pay the Investment Manager an investment management fee, determined in accordance with the Schedule of Fees attached hereto as Schedule B, in consideration for its services hereunder.

6.  Certain Representations and Acknowledgements.

Each of the Client and the Investment Manager represents and warrants that it is duly authorized and empowered to execute, deliver and perform this Agreement and that such action does not conflict with or violate any provision of law, rule or regulation, contract, deed of trust or other instrument to which it is a party or by which it or its property is bound.

If the Client is an "employee benefit plan" or a "plan" (a "Plan") within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the trustee or other named fiduciary of a Plan, then the Investment Manager acknowledges that it is a "fiduciary" within the meaning of Section 3(21) of ERISA with respect to the Plan and agrees that it is subject to and will at all times exercise the standards of fiduciary responsibility set forth in Title I, Subtitle B, Part 4 of ERISA, which it acknowledges it has examined and with which it is familiar.

The Advisor shall have no right or responsibility to vote proxies solicited by, or with respect to, the issuers of any securities held in the Account. The Client represents that the Client has retained all right and responsibility to vote proxies.

The Client represents that the Investment Manager did not solicit the Client to enter into this Investment Management Contract or otherwise to enter into an investment management relationship with the Investment Manager.

7.  Other Investment Advisory Activities of the Investment Manager.

The Client acknowledges and agrees that (a) the Investment Manager may have investment management responsibilities to other persons, firms and organizations to which it provides investment management services, including other customers' discretionary accounts and investment companies for which it serves as investment manager, (b) the Investment Manager shall be permitted to take actions with respect to the Account which differs from that taken with respect to other accounts and customers even though the investment objectives may be the same or similar, provided that, where there is a limited supply of a security, the Investment Manager seeks in good faith to allocate or rotate investment opportunities to the Client on a fair and equitable basis relative to such other accounts and customers, taking into consideration the investment objectives and investment restrictions to which such other accounts and customers are subject, (c) the Investment Manager and/or Related Persons may from time to time have an interest, direct or indirect, in a security which is purchased, sold or otherwise traded for the Account and may effect transactions in said security for the Account which may

2

MS 00420

be the same as or different from the action which the Investment Manager and/or such persons may take with respect thereto for its or their account, (d) the Investment Manager may, as agent for the Client, effect transactions for the Account while also acting as agent for another customer of the Investment Manager which is a counterparty to such transaction, and (e) the Investment Manager may aggregate sales and purchase orders for the Account with similar orders being made simultaneously for other portfolios managed by the Investment Manager if, in its reasonable judgment, such aggregation will result in an overall economic benefit to the Account, taking into consideration the advantageous selling or purchase price, brokerage commissions and other expenses, and trading requirements, provided that, in accounting for such aggregated orders, price and commissions shall be averaged on a per security basis.

8.  Standard of Care; Liabilities of the Investment Manager.

      The Client acknowledges and agrees that (a) any and all investments made by the Investment Manager will constitute an expression of investment opinion only that will be based upon information that the Investment Manager believes to be reliable but cannot guarantee to be accurate, and (b) except for negligence, malfeasance, or violation of applicable law, neither the Investment Manager nor any of its Related Persons shall be liable for any action performed or omitted to be performed or for any errors of judgment in managing the Account.  Federal and various state securities laws may afford the Client certain rights and remedies under certain circumstances, even in the absence of negligence, malfeasance or a violation of law by the Investment Manager or its Related Persons, and even if the Investment Manager and such Related Persons have acted in good faith, and nothing contained herein shall in any way constitute a waiver or limitation of any such rights and remedies that the Client may have under any such federal or state securities laws.

9.  Termination.

      The Investment Manager and the Client agree that this Agreement shall be terminable by either party by written notice delivered to the other party prior to the effective time of such termination, but any such revocation shall not affect any liability of the Client or the Investment Manager in any way resulting from transactions initiated prior to the effective time of such termination.  In the event of such termination, any fees paid in advance by the Client shall be prorated, and any portion unearned by the Investment Manager as of the effective date of such termination shall be refunded to the Client.

10. FORM ADV.

      The Client acknowledges receipt of the Investment Manager's Disclosure Statement, Part II of the Investment Manager's Form ADV, as amended to date, or a separate brochure which contains the same information as is in such Part II, as required by the Investment Advisers Act of 1940, as amended.

3

MS 00421

**11. Notices.**

Written communication(s) given pursuant hereto shall be addressed to the Investment Manager or the Client, as the case may be, at the address set forth on the signature page hereto or at such other address as may hereafter be specified in a written communication given pursuant hereto.

**12. Miscellaneous.**

This Agreement constitutes the entire agreement between the Investment Manager and the Client and supersedes and replaces all prior agreements, arrangements, representations and memoranda of understanding between the Investment Manager and the Client relating to the subject matter of this Agreement. This Agreement may not be amended or modified in any respect except in a writing signed by both parties. This Agreement may not be assigned by either party without the prior written consent of the other party.

In the event that any term or provision of this Agreement shall be determined to be invalid or unreasonable by any court of competent jurisdiction, the remainder of this Agreement shall nevertheless continue to be valid and fully enforceable.

This Agreement shall be construed in accordance with and governed by the laws of the State of New York applicable to agreements made and solely to be performed in such State.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

Social Security # or TIN:          The Client:

76-6073039          _____

          Address:


NewBridge Partners, LLC

By:_____
Its:

Address:
    535 Madison Avenue, 14th Floor
    New York, NY  10022

4

MS 00422

SCHEDULE A

## DELEGATION OF INVESTMENT POWER

(Limited Power of Attorney)

The undersigned (the "Client") has made, constituted and appointed, and by these presents does constitute and appoint, NewBridge Partners, LLC, a Delaware limited liability company, the true and lawful attorney for the Client, and in the Client's place and stead, to manage, handle and direct the account(s) numbered 250-135795-240 collectively, (the "Account") now standing in the Client's name, with MSDW (the "Broker/Custodian"), to buy, sell, exchange, convert, tender, trade, lend and, in any and every other way it seems fit, to handle, dispose of, acquire and deal in bonds, stocks and other securities and/or contracts relating to the same with or through said Broker/ Custodian; to execute agreements relating thereto in the Client's name or otherwise on the Client's behalf; and to make, execute and deliver assignments and transfers of any and all stocks, bonds and other securities, and to that end to sign the Client's name to any and all written instruments of assignment or otherwise which may be required in connection with such assignment.

This limited power of attorney shall apply to the Account until written notice of revocation hereof is given by the Client to NewBridge Partners, LLC and the Broker/ Custodian, and the Client hereby ratifies and confirms any and all acts heretofore done, or which may hereafter be done or caused to be done by virtue hereof by the Client's said attorney, giving and granting unto said attorney limited power and authority to do and perform, all and every act and thing whatsoever requisite and necessary to be done with respect to the Account as fully to all intents and purposes as the Client might or could do if personally present.

This authorization is a continuing one and shall remain in full force and effect until revoked by the Client by a written notice given to NewBridge Partners, LLC and the Broker/Custodian, but such notice and such revocation shall not affect any liability in any way resulting from transactions initiated prior to the effective time of such revocation. This limited power of attorney shall remain in effect irrespective of any change or changes at any time in the personnel of the Client or NewBridge Partners, LLC.

IN WITNESS WHEREOF, the undersigned has hereunto set or caused to be set my/its hand this 1 day of June, 1999. 2000

CLIENT NAME:

5

MS 00423

SCHEDULE B

<u>SCHEDULE OF FEES</u>

The schedule is an integral part of the attached Investment Management Agreement between the Client and the Investment Manager.

1.   The schedule of annual fees for investment management services is as follows:

| Assets Under Management | Annual Fee Rate |
|---|---|
| On the first | |
| $____5,000,000 or fraction thereof | 1.50% |
| On the next | |
| $____5,000,000 or fraction thereof | 1.00% |
| On amounts in excess of | |
| $___10,000,000 or fraction thereof | 0.50% |

2.   In consideration for its services under this Investment Management Agreement, client agrees to pay the Investment Manager a fee, in arrears, on the first business day of each calendar quarter at the annual fee rate set forth above. Said fee shall be calculated based upon the Fair Market Value of the Account at the close of business on the last day of the calendar quarter. The "Fair Market Value" of the Account shall be determined in good faith by the Investment Manager, based on the most recent closing sales prices or bid prices, as appropriate for the securities held in the Account, or, if neither of such methods is available or appropriate for the asset in question, such other determinants of value as the Investment Manager in good faith believes to be appropriate under the circumstances. In connection with the determination of Fair Market Value, the Investment Manager may rely upon the information or reports printed in any newspaper or general circulation published in New York or in any other newspaper which the Investment Manager deems appropriate, or on the records, whether "on-line" or in print, of any securities exchange or registered securities association. In the event that this Investment Management Agreement is terminated as of a date other than the last day of a calendar quarter, then with respect to the quarter in which such termination occurs, the Client agrees to pay a fee, in arrears, to be calculated as if the date of termination was the last day of such quarter, but prorated based on the number of days in such quarter which have elapsed through the date of termination.

3.   The Client may authorize the Broker/Custodian to pay these fees directly from the account or choose to pay these fees directly. Unless otherwise indicated, these fees will be paid directly from the Account.

     _____/_____ Charge Custody Portfolio          _____ Bill Client

4.   Depending upon the relationship, multiple portfolios with a common interest may be treated as one for billing purposes as agreed in a separate writing by the Investment Manager and the Client.

6

MS 00424

# Exhibit 2

## INVESTMENT ADVISORY AGREEMENT

Client Title: _Katherine Kirby & Barbara Kirby_
_Nyhart Children Trust_

**McKINLEY CAPITAL MANAGEMENT, INC.**

McKinley Number: _____

### ADVISER

The undersigned Client hereby appoints McKinley Capital Management, Inc. ("Adviser") as Client's investment adviser and sole agent and attorney-in-fact for the above referenced account, with full power and authority to manage for Client a portfolio of certain investments and to substitutions and replacements thereto (the "Portfolio") upon the terms and conditions set forth herein.

**1.    Trading Authorization and Limited Power of Attorney.**

Client authorizes Adviser to exclusively invest and reinvest the assets in the Portfolio on behalf of Client. Adviser's authority includes the power to purchase, sell, exchange property and to trade in stocks, bonds, and any other securities, commodities or other properties, issued or unissued, on margin or otherwise, in accordance with your terms and conditions for the account and risk of the undersigned and in the name or account number of the undersigned. Said authority is also inclusive the power to exercise whatever rights are conferred upon the holder of proxies held by the Portfolio including (without limitation) the power to exercise rights, warrants, conversion privileges, redemption privileges, to tender securities pursuant to a tender offer and the like, provided that Adviser shall not have authority to and shall not vote proxies ... in the Portfolio ... Adviser may invest all or a portion of the assets of the Portfolio in interest of other beneficial interest of one or more investment companies ("mutual funds") or other collective investment funds advised by Adviser, provided that the ADVISORY fees payable under paragraph 5 of this Agreement shall be reduced by a pro rata portion of any advisory fee paid to Adviser by such fund(s). The undersigned hereby agrees to indemnify ... hold you harmless, and ... you promptly upon demand, from any and all losses arising ...transfrom or debit balance due ther...

In all such purchases, sales ... or transactions the bro... of McKinley Capital Management, Inc. in every respect concur-... to act for and on behalf of the undersigned in the same manner and... do with respect to all other transactions necessary or incidental to the transactions.

... BrokerDealer is authorized to follow the instructions ... undersigned's account with you and Adviser is authorized ... issues force and affects the undersigned rights or could ... nbsence or conduct of such ...

The undersigned hereby ratifies and confirms any and all transactions heretofore or hereafter made by Adviser for the account of the undersigned.

This authorization and indemnity is in addition to (and in no way limit or rescind) any rights which the BrokerDealer may have under any other agreements or agreement between the BrokerDealer and me undersigned.

This authorization and indemnity is a continuing one and shall remain in full force and effect until revoked by the undersigned by a written notice addressed to and actually received by the BrokerDealer, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation. (This authorization and indemnity shall inure to the benefit of the present BrokerDealer and of any successor firm or firms by conjecture of any change of changes at any time in the personnel thereof for any cause whatsoever, and of the assigns of your present firm or any successor firm.)

Adviser's authority with respect to the Portfolio is exclusive. Client shall not purchase, sell or exchange property for the Portfolio nor permit any party other than Adviser to purchase, sell or exchange property for the Portfolio if Client is a Trust, Client shall provide Adviser with a copy of all amendments to its trust agreement or similar governing document.

Adviser shall be responsible for managing the Portfolio in accordance with any client investment objectives and restrictions that Client communicates to Adviser. Client understands that Adviser does not offer financial planning or investment supervisory services and that investments in equity securities should constitute only a portion of the Client's entire investments invested over an extended period of time.

Client retains sole duty to exercise voting rights with respect to securities in the Portfolio. Adviser shall not be required or held responsible for forwarding proxy material to Client.

**2.    Employment of Brokers.**

Client hereby directs Adviser to effect transactions involving property held or to be held in the Portfolio through the broker designated below:

_MSDW_
Brokerage Firm Name

_850 - 135441 - 240_
Brokerage Account Number

_Roll Harbart_                   _M MD_
Name of Representative                ASR

_6263 N. Scottsdale Rd #300_
Address

_Scottsdale AZ 85250_
Address

_(480) 922-7848   (480) 922-7855_
Telephone                  Fax

MS 00807

2.   Employment of Brokers (cont.)

Client understands that by directing brokerage to the above broker, Client may forego certain benefits that may otherwise be available (such as lower commission expenses) if Adviser were to combine a broker on Client's behalf. Adviser may execute transactions (including batch transactions) through other brokers/dealers to obtain best price and terms. Client understands that Adviser generally will not negotiate more favorable commission rates from the above broker. Client further understands that Adviser may batch transactions for the Portfolio with transactions on behalf of other clients and that depending on the commission rate charged by the above broker, Client may pay higher commissions than with other clients.

If Client has instructed brokerage to a particular broker, Adviser may designate a broker to engage in any transaction involving property held or to be held in the Portfolio, in selecting a broker or brokers on behalf of Client, Client understands and agrees that Adviser may take into consideration, in addition to the commission rate, the reliability and efficiency in executing orders and the condition of investment research viewed in terms of either the particular transaction or in terms of Adviser's overall responsibilities with respect to the accounts over which Adviser exercises responsibility.

Client understands that Adviser's ability to obtain best commission on Client's transactions may be affected by the Adviser's use of brokers as a source of research.

Adviser shall not be liable to Client for any act of or breach of duty by any broker.

3.   Custody of Portfolio and Cash; Appointment of Custodian.

Physical custody of the Portfolio and of any uninvested cash balance relating thereto shall be maintained by the institution designated below (the "Custodian") and not by Adviser.

Custodian:   __KARD U__

Client shall forthwith enter into a custodial agreement (or trust agreement) with the Custodian in form and substance satisfactory to Adviser and shall instruct the Custodian to engage in transactions with respect to the portfolio solely upon instructions of Adviser. Client shall give the Custodian standing instructions to forward to Adviser confirmations of all transactions relating to the Portfolio, together with copies of monthly and other statements relating to the Portfolio. The Custodian shall be solely responsible for settlement of all transactions entered on behalf of the Portfolio and receipt and disbursement of funds for and from the Portfolio. Adviser may rely upon reports from the Custodian as to contents of the Portfolio, settlement of transactions and the location, description and amounts of properties constituting the Portfolio. Adviser shall not be liable to Client for any act of or breach of duty by its Custodian.

4.   Reports, Information and Cooperation.

Adviser shall furnish Client with a quarterly written report setting forth the status of property held in the Portfolio, in Adviser's customary format. Adviser shall maintain the strictest confidence with regard to Client's financial affairs and Client will keep all investment advice furnished by Adviser as confidential and for Client's exclusive use and benefit.

Client shall be responsible for communicating to Adviser Client's investment objectives and requirements for the Portfolio.

5.   Advisory Fee.

In consideration of the services to be rendered by Adviser, Client shall pay to Adviser quarterly, in advance, a fee according to the Cumulative Fee Schedule contained herein.

Calculation of the fee shall be based upon the fair market value of the Portfolio (including cash or its equivalent) as determined by Adviser as of the date hereof and on the first quarterly payment of fees, and thereafter as of the last day of the last calendar quarter immediately preceding the calendar quarter for which the fee is payable. The fee payable for any portion of a calendar quarter shall be prorated. Valuations on listed securities shall be the last sale price on, if no sale occurred, then the mean between the bid and asked price. Unlisted securities will be valued at the bid price and as if, if any, at principal amount. Securities which do not have an ascertainable market price shall be valued at a fee.

A prorated management fee invoice or refund will be calculated for cash deposit or withdrawal during a calendar quarter. Client and/or Broker shall notify Adviser in writing of any deposit and/or withdrawal.

In the event that this agreement is terminated as hereinafter provided, the Portfolio shall be valued as of the termination date, and that last shall be paid based upon that valuation and prorated from the end of the prior quarter to such date.

Client has executed the Adviser's Investment Instructions to Adviser and the Client New Account Information forms.

Client agrees to pay collection costs incurred in the event Adviser must submit account to collection for payment of outstanding management fees.

Balanced accounts are billed on a pro rata basis based on equity/income percentages.

The Broker/Master or Custodian named herein is hereby authorized and directed to accept this agreement as my instruction to me for payment of account management fees as billed by the Adviser. You are directed to pay these fees without further instructions from the undersigned. You are directed to issue payment to McKinley Capital Management, Inc. at 3301 C Street, Suite 500, Anchorage, AK, 99503, unless otherwise directed by Adviser. Please take these funds from cash or money market balances in my account. You are directed to make payment to Adviser within 10 (ten) business days of the receipt of my quarterly billing

-2-

MS 00808

In the event that I, the Client, change broker/dealers or custodians during the calendar quarter, you are directed to pay Adviser the full amount billed for the entire quarter.

**5.  Advisory Fee (cont.)**

Billing Agent

| Cumulative Fee Schedule | | | |
|---|---|---|---|
| **Domestic & International Portfolio* Amount** | **Annual Fee** | **Fixed Income Portfolio Amount** | **Annual Fee** |
| $100,000 - $500,000 | 1% | First $1 Million | 0.80% |
| Over $500,000 | .85% | Next $1 Million | 0.70% |
| | | Next $1 Million | 0.60% |
| | | Next $1 Million | 0.50% |
| | | Next $1 Million | 0.45% |

*Amounts less than $100,000, accepted upon prior approval, will be charged a minimum fee of 1.5%.

**6.  Services To Other Clients.**

Client understands that Adviser furnishes investment advisory services for various clients. Client agrees that Adviser may give advice and take action with respect to any of its other clients (including affiliates and employees of Adviser) which may differ from advice given or the timing or nature of action taken with respect to the Portfolio, so long as it is the Adviser's policy, to the extent practical, to allocate investment opportunities to the Portfolio over a period of time on a fair and equitable basis relative to other clients. It is understood that Adviser shall not have any obligation to purchase or sell any security which Adviser, its principals, affiliates or employees may purchase or sell for its or their own accounts for the account of any other client, if in the opinion of Adviser such transaction or investment appears unsuitable, impractical or undesirable for the Portfolio.

**7.  Terms of Agreement.**

This agreement shall exist from the date hereof unless terminated as provided herein. Client may terminate this agreement upon Adviser's receipt of written notice, provided that Adviser receives such notice within five business days following the date hereof. The agreement may thus be terminated at any time by mutual consent of the parties, or without such consent by either party giving to the other 10 (ten) days written notice of termination. If Client is an individual, this agreement shall terminate upon Adviser's receipt of written notice at death or legal incapacity of Client. Termination of this agreement shall not, in any case, affect or preclude the consummation of any transaction initiated prior thereto. If this agreement is terminated, Adviser shall return to Client a pro rata portion of any prepaid management fee.

**8.  Representations of Adviser.**

Adviser represents to Client that Adviser is registered as an Investment Adviser under the Investment Advisers Act of 1940 and, if Client is an "employee benefit plan" as defined in the Employee Retirement Income Security Act of 1974, that Adviser is a fiduciary with respect to the Portfolio.

Adviser represents to Client that Robert B. Gillam has been retained as the Chief Investment Officer and that Adviser will notify Client, if Robert B. Gillam ceases to remain as Chief Investment Officer for Adviser within a reasonable time after such occurrence.

**9.  Assignment.**

No assignment of this agreement shall be made by Adviser without consent of Client.

**10.  Liability.**

Adviser shall have no duty, responsibility or liability whatever with respect to any of Client's property not constituting a portion of the Portfolio.

**11.  Amendment.**

This agreement may be amended only by written instrument, effective on a date agreed upon, dated and signed by both of the parties hereto.

-6-

MS 00809

3

## FEE SCHEDULE AMENDMENT
INVESTMENT ADVISORY AGREEMENT

McKinley Fee Schedule for Domestic and International Equity Accounts is amended as follows:

| Amount | Annual Fee | | Account # 250-135441-240 |
|---|---|---|---|
| $200,000 - $500,000 | 1% | | |
| Over $500,000 | .75% | | |

AGRE      ND ACCEPTED:

_Kathryn Kelly Stevens_      3/4/02

Kathryn Kelly Stevens

McKinley Capital Management, Inc.

By: _____
    Diane Wilke, Vice President

### McKinley Capital Management, Inc.
3301 C Street, Suite 500 · Anchorage, Alaska 99503
(907) 563-4488 · Main FAX (907) 561-7142
New Accounts FAX (907) 562-3859
http://www.mckinleycapital.com/
E-mail:info@mckinleycapital.com

*Registered Investment Advisers*

MS 00811

ACCOUNT DOCUMENTATION FOR ALL TRUSTS, PENSIONS, PROFIT SHARING PLANS, ESTATES, ETC.

Fiduciary Certification of Investment Powers

Brokerage Account No. _283-135441-XVD_                    McKinley Capital No. _____

For McKinley Capital Management, Inc.

In consideration of your managing the herein named account for the trust, pension, profit-sharing plan, estate or other entity named below, I or we, the undersigned fiduciary or fiduciaries as applicable, certify as follows:

1.  This certification applies to the account titled _Halfaype, Ruth & Jamies Fiduciee_
    _Marlowe Childrens Trust_
    (example: John Jones, Trustee for the benefit of Mary Jones; John Jones, Executor for the Estate of Mary Jones; John Jones, Trustee for the Jones Family Trust)

2.  The date of the operating documents (trust will, pension plan, etc.) is: _9/12/91_

3.  There are no fiduciaries other than the individuals named below. If only one person is named below, it shall be a representation that the person named is the sole fiduciary.

4.  This certification authorizes you to accept, act on and other instructions relative to the account as titled above from those individuals or entities named below. This includes, but is not limited to, authorization to buy, sell or hold securities and to receive and disburse monies. The individuals named may execute any documents which you may require relative to the opening or managing of the account. Any documents executed by any of the listed fiduciaries shall be conclusive evidence that the fiduciary is authorized to enter into the transactions contemplated by such documents(s). Unless it is specified otherwise, any of those listed below may individually act on behalf of the account.

— LIST ALL AUTHORIZED FIDUCIARIES —

_____

_____

5.  We certify that we have the power under the applicable operating documents and applicable law to enter into transactions, both purchases and sales, of the type specified below (mark which transactions are permitted):

    ☑ Appointment of Investment Manager      ☐ Corporate Debt             ☐ Real Estate Investment Trusts
    ☑ Payment of Services from the account     ☐ Mutual Funds              ☑ Principal Securities
    ☑ U.S. Government Securities               ☐ Margin Transactions       ☑ U.S. Agency Securities
    ☐ Master Limited Partnerships              ☐ Certificates of Deposit   ☐ Short Selling of Securities
    ☑ Corporate Equity Securities (including Small Capitalization Sec.)

    We, the fiduciaries, jointly and severally indemnify you and hold you harmless from any liability for effecting transactions of the type specified above, should you act pursuant to instructions given by any of the individuals named listed under paragraph 4 of this certification.

6.  We agree to inform you, in writing, of any amendment to the trust, pension or profit-sharing plan or other relevant document, of any change in the composition of the fiduciaries or of any other event which could alter the certification made above.

Certified as of _January, 2000_

_____          _____
Signature & Title                       Signature & Title

By:_____          By:_____
Signature & Title                       Signature & Title

— ALL FIDUCIARIES MUST SIGN —
— ITEMS 1,2,3, AND 5 MUST BE COMPLETED —

This form must be completed in full and on file prior to the first trade instruction by McKinley Capital Management.

MS 00812

## MONEY MANAGEMENT SERVICES

**MCKINLEY CAPITAL MANAGEMENT, INC.** is a Registered Investment Advisory firm specializing in growth portfolios beginning at $100,000. We are an earnings based, bottom-up, growth manager seeking long-term, capital appreciation with controlled market risk. Investment decisions are based on the philosophy that excess market returns can be achieved through the combination and series management of a diversified, fundamentally sound, portfolio of inefficiently priced common stocks whose earnings growth rates are accelerating above market expectations.

McKinley Capital's portfolios are constructed with a consistent, disciplined process. Beginning with a broad universe of 225 and international publicly traded companies, McKinley Capital's return-to-risk ratio of each security. The result is a list of near screening steps designed to eliminate growth structural char buy trading volume, and market capitalization specific to each candidate that are examined closely for fundamental earning company reported earnings surprises, positive analysts earning expectations. The analysis generally ranks a a list of 120 – 2 portfolio management team analyzes each holding, having passed final client portfolio of approximately 40 – 70 stocks. Each can very narrow dispersion of investment returns.

... stocks for relative attractiveness by modeling the ... holdier that is further reduced by a series of ... ... ch is), minimum stock price, $1 million average 20 ... portfolio. This screening typically results in 200 ... tors. These, in order of importance, are positive ... ... s and analyst general agreement of earnings ... ... of candidates. The chief investment officer and the ... ... ve review to a qualitative evaluation. The result is the ... ... s specific mandate holds the same issues, assuring a ...

Ten asset management programs, covering a broad range of r ... the experienced investor the Growth Equity All Cap Portfolio ... Cap Equity Portfolio, consisting of middle to high capitalization ... stocks and cash equivalents; the Mid Cap Equity Portfolio, consisting of only middle capitalization stocks and cash equivalents; the Focus Equity Portfolio, consisting of the best current holdings of the Growth Equity All Cap Portfolio; the Small Cap Equity Portfolio, consisting of only small capitalization common stocks and cash equivalents; the Global Equity Portfolio consisting of international common stocks and cash equivalents; the Global Equity Portfolio consisting of international and domestic common stocks; the Monthly Income Portfolio, consisting of high-yield common and bond fund, high-yield common stocks, and cash equivalents; and the Balanced Allocation Portfolio, combining our Monthly Income Portfolio with one of our Equity Portfolios in a ratio specific to the individual clients needs.

- **GROWTH EQUITY ALL CAP PORTFOLIO:** McKinley Capital's original, all-capitalization, aggressive portfolio, it is designed for the growth-oriented investor possessing a strong understanding of the risks and potential rewards associated with investing in high growth companies. The objective of this portfolio is to achieve "excess market returns" over the full market cycle i.e. greater long-term performance than the Russell 3000 Growth index. This program focuses on growth stocks ranging the full spectrum of market capitalization. Investors can expect this account's volatility to be higher than that of the S&P 500 index. Minimum account plus is $100,000 (wrap), $250,000 (non-wrap).

- **FOCUS EQUITY PORTFOLIO:** This portfolio is derived from the best current holdings of McKinley Capital's Growth Equity All Cap portfolios. Portfolio positions are generally limited to a maximum of 25 so that each equity commitment represents approximately 4% of the portfolio at cost. Individual capital appreciation (or depreciation) will therefore significantly affect portfolio results. Portfolio volatility may exceed the volatility of blended McKinley Capital portfolios. Portfolio positions will be focused in those issues deemed to have superior market potential over the next several quarters. Sector div ... zation will, however, remain an objective of the portfolio as a risk control device. This portfolio should be used by ... sales equity investors who understand the risks associated with portfolio concentration in a limited number of iss ... id ... n issues sector diversification. The objective of this portfolio is to achieve "excess market returns" o ... full market cycle i.e. greater long-term performance than the Russell 3000 Growth index. Minimum account ... $250,000.

- **SCIENCE & TECHNOLOG ... RTFOLIO:** The Science and Technology Equity Portfolio is an all capitalization, aggressive sector portfolio designed for ... owth-oriented investor possessing knowledge of the risks and potential rewards with investing in the growing science ... d technology companies. The portfolio is designed for investor, who wish to achieve "excess market returns" but wh ... at they accept above average volatility associated with investing in a concentrated portfolio of science and technology companies. This portfolio should be used to complement an existing McKinley Capital portfolio or other equity investment. The portfolio's objective is to achieve the highest possible return for a full market cycle i.e. greater long-term performance than the Morgan Stanley High Tech index. Minimum accounts also is $250,000.

MS 00813

## FORMS INSTRUCTIONS AND BROKER RESPONSIBILITIES

**■ Interested Party Setup**

It is important that you arrange with your home office for McKinley Capital to receive a duplicate copy of your client's monthly statement.

Additionally, please setup McKinley Capital as an "Institutional Interested party" using McKinley Capital's institutional DTC number 74239*

*Note: Smith Barney accounts do not require setup through DTC.*

**■ Investment Advisory Agreement**

Page one:        Fill in exact client name/title of account. Enter Broker information at bottom.

Page two:        Enter precise Custodian information.

Page six:        Enter exact Billing Agent information.

Page seven:     Have all parties sign and date.

**■ Client New Accounts Information**

To comply with the Securities & Exchange Commission's "Know Your Client" rule, it is required that this form be completed in full and signed by all parties. Information will remain confidential.

**■ Investment Instructions to Adviser**

Check the appropriate Asset Management Program.

Fill in commission direction or trade Wrap.

Fill in value of accounts. Include a position page if account holds securities.

Have all parties sign and date.

**■ Fiduciary Certification of Investment Powers**

Required for all Trusts, Pension Plans, Profit Sharing Plans, Estates and Partnerships. Clarifies and certifies the undersigned parties authority to place assets under management. This form must be completed in full and on file prior to the first trade instruction by McKinley Capital Management.

**➤ Broker Responsibilities**

Please notify the New Accounts department when any of the following actions affect the client account:

Account number change
Client address change
ACAT transfer out
Deposits/Withdrawals
Account closure (by client request)

*Please retain a copy of the forms for your records and a copy for your client.*
*Return all original forms to:*

McKinley Capital Management, Inc.
New Accounts Department
3301 C Street, Suite 500
Anchorage, AK 99503 (907) 563-4488
(907)561-7142 Main Fax · (907)562-2859 New Accounts Fax

*Complete All Forms Before Forwarding to McKinley Capital. Incomplete Forms Will Delay Trading.*

MS 00782